UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------
SHAILENDRA JOSHI,

                    Plaintiff,                    17-cv-4112 (JGK)

          - v.-                                   OPINION AND ORDER

THE TRUSTEES OF COLUMBIA UNIVERSITY
IN THE CITY OF NEW YORK, COLUMBIA
UNIVERSITY IN THE CITY OF NEW YORK,
and COLUMBIA UNIVERSITY COLLEGE OF
PHYSICIANS AND SURGEONS,

                    Defendants.
------------------------------------
JOHN G. KOELTL, District Judge:

     The plaintiff, Dr. Shailendra Joshi, a citizen of the State

of New Jersey and an Assistant Professor of Anesthesiology at

the Columbia University College of Physicians and Surgeons

("CUCPS"), an affiliate of Columbia University in the City of

New York (the "University"), brings this action against CUCPS,

the University, and the Trustees of the University (together

with CUCPS and the University, the "defendants" or "Columbia"),

alleging five state law causes of action for breach of contract,

breach of the covenant of good faith and fair dealing,

promissory estoppel, fraud in the inducement, and violation of

Section 715-b of the New York Non-Profit Revitalization Act of

2013, N.Y. Not-for-Profit Corp. Law § 715-b. Dr. Joshi alleges

that the defendants retaliated against him because he reported

research misconduct by a distinguished colleague. The plaintiff

initiated this case by filing a complaint on June 1, 2017, which he amended on August 31, 2017 (the "Amended Complaint"). The defendants now move to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

## I.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the Amended Complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662 (2009). While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." Id.

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the Amended Complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); see also Millennium Health, LLC v. EmblemHealth, Inc., 240 F. Supp. 3d 276, 279-80 (S.D.N.Y. 2017).

## II.

Unless otherwise noted, the following facts are alleged in the Amended Complaint.

Dr. Joshi is an Assistant Professor in the Neuroanesthesia Division of the University's Department of Anesthesiology, where he has been a faculty member since 1997. Am. Compl. ¶ 7. Dr. Joshi has authored over 60 scientific papers, as well as numerous book chapters, and has given over 150 scientific presentations. Id. ¶ 8. Dr. Joshi is also the Section Editor for Laboratory Reports and a member of the Editorial Board of the Journal of Neuroanesthesiology. Id. ¶ 9. Dr. Joshi has received two awards from the University for his research. Id. ¶¶ 11, 12.

Since approximately 2001, Dr. Joshi has conducted clinical cerebrovascular research related to the delivery of drugs to the brain at a laboratory he established at the University, which

3

has been supported with multiple research grants, including three grants from the National Institutes of Health ("NIH"). Id. ¶¶ 10, 13.

On February 3, 2006, the Columbia University Senate adopted the Columbia University Institutional Policy on Misconduct in Research (the "Research Misconduct Policy"). Id. ¶ 17. The Research Misconduct Policy states that it "is based on the Federal Policy on Research Misconduct (the 'OSTP Policy') of the Office of Science and Technology Policy" and that it "is a University-wide Policy which applies to all individuals, including Officers of Instruction, Officers of Research . . . students and members of the research staff, who may be involved in research at the University and all research conducted by such individuals . . . ." Id. The Research Misconduct Policy defines fabrication and falsification and states that the University is "cognizant of the need for protections for the complainant, the respondent and all witnesses involved in any misconduct proceeding." Id. ¶ 19. In Section K(3), entitled "Safeguards for Complainants," the Research Misconduct Policy states, with respect to good faith reports of research misconduct, that "the University shall ensure that the Complainant is treated fairly and reasonably; all reasonable and practical efforts are made to protect the Complainant from actual or potential retaliation;

4

[and] diligent efforts are made to protect or restore the position and reputation of the Complainant." Id. ¶ 20.

The Research Misconduct Policy is accessible on the University's website and is also Appendix C to the University's Faculty Practice Handbook (the "Faculty Handbook"), which is itself accessible through the University's website. Id. ¶ 22. The standalone Research Misconduct Policy does not contain any disclaimer language; however, the version attached as Appendix C to the Handbook that is accessible through the University's website contains a link entitled "Reservation of Rights" in blue font at the end of Appendix C. Id. ¶¶ 21, 22. The "Reservation of Rights" disclaimer provides that the Handbook "is not intended to and should not be construed as a contract between the University and any Faculty Member[.]" Id. ¶ 23.

In or around March 2014, the University adopted the Columbia University Non-Retaliation Policy (the "Non-Retaliation Policy") in order to "reinforce that the University prohibits retaliation against those individuals who report or seek guidance on possible ethical or compliance issues in good faith" and to "encourage members of the Columbia University community to report compliance and ethics concerns or to seek guidance on compliance and ethics concerns." Id. ¶ 27. The Non-Retaliation Policy states that the University "expects members of the University community to inform the appropriate parties if they

5

have observed unethical, illegal or suspicious activity." Id.
The Non-Retaliation Policy, together with the Research
Misconduct Policy, are referred to in this Opinion as the
"Policies."

The Non-Retaliation Policy defines retaliation to include
"any action, statement, or behavior that is designed to punish
an individual for filing a compliance report, cooperating with a
compliance investigation, seeking guidance concerning a
compliance concern or to deter one from taking such action[,]"
and states that retaliation "includes, but is not limited to,
intimidation, adverse action against an employee regarding the
terms and conditions of employment, such as termination,
demotion, or suspension, as well as related threats of such
actions." Id. ¶ 28. The Non-Retaliation Policy is accessible
through the University's website and does not contain any
disclaimer language. Id. ¶ 29.

The website of the University's Office of Research
Compliance and Training, which administers the Research
Misconduct Policy, also states that the "University does not
tolerate retaliation against those who report a compliance
concern in good faith." Id. ¶ 30. The Office of Research
Compliance and Training's website also contains information
about the University Compliance Hotline for reporting compliance
concerns and indicates that the Hotline should be used for

reporting falsified research results. Id. The website does not contain any disclaimer language. Id. On December 9, 2014, Jeffrey Kestler, the University's Associate General Counsel and Compliance Officer, disseminated an email with the subject line "Columbia's Commitment to Compliance and Ethics — Compliance Hotline Brochure," referring recipients to the Non-Retaliation Policy and the Compliance Hotline. Id. ¶ 31.

In or around December 2014, Dr. Joshi became aware that research articles authored by a senior faculty member (the "Faculty Member") in the Anesthesiology Department (the "Department") relating to risk factors of cognitive dysfunction after carotid artery surgery contained inaccurate, falsified, or fabricated data. Id. ¶ 14.[1] Dr. Joshi approached the Faculty Member about his concerns with the data, but the Faculty Member made no changes to the data. Id. ¶ 33. Dr. Joshi then raised his concerns with colleagues in the Neuroanesthesia Division and with the Vice-Chair for Departmental Research, Dr. Charles Emala, but Dr. Joshi received no response, and the data was not corrected. Id. ¶ 34.

Beginning in February 2015, after Dr. Joshi raised his concerns with colleagues in the Department and the Vice-Chair of Departmental Research, the Department made significant cuts to

---

[1] The plaintiff alleges that this data has now been used in a successful application for a grant from the NIH. Id. ¶ 15.

Dr. Joshi's Department-supported dedicated research time. Id. ¶ 43. The Department protected the research time of other members of the Department, and Dr. Joshi was regularly allotted the least amount of Department-supported dedicated research time of any member of the Department. Id. ¶¶ 43, 44.

On March 4, 2015, Dr. Joshi wrote to the Chair of the Department, Dr. Margaret Wood, requesting a joint appointment to the Neurosurgery Department and a title change to Associate Professor, which Dr. Joshi thought would increase his chances of securing the NIH funding for which he was in the process of applying. Id. ¶ 52. Although Dr. Joshi had published extensively in Neurosurgery journals, had published and worked with colleagues in the Neurosurgery Department, and was conducting research that "is of immediate interest to neurosurgeons and their patients," Dr. Wood ignored Dr. Joshi's request, even though such requests are routinely granted. Id. ¶¶ 52-54.

Up until March 5, 2015, Dr. Wood, had permitted faculty NIH-funded members to opt out of working on Electroconvulsive Therapy ("ECT"). Id. ¶ 45. However, on March 5, 2015, Dr. Wood assigned Dr. Joshi, and only Dr. Joshi, to work on ECT. Id. No other faculty member had been required to work on ECT. Id.

Relying on the protections for complainants who report research misconduct in the Research Misconduct Policy and the Non-Retaliation Policy, on April 3, 2015, Dr. Joshi filed a

formal complaint of research misconduct with Naomi Schrag, the Associate Vice-President of the University's Office of Executive Vice-President for Research. Id. ¶¶ 35, 37, 38. Following this complaint, several faculty members, including the Faculty Member, about whom Dr. Joshi had complained, were provided with more Department-supported dedicated research time than Dr. Joshi, and Dr. Joshi was regularly allotted the least amount of Department-supported dedicated research time in the Department. Id. ¶ 48.

In or around August 2015, Dr. Joshi complained to Ms. Schrag; Dr. Emala, the Vice Chairman of Research for the Department; and Dr. Anne Taylor, the Senior Vice President for Faculty Affairs and Career Development at the University, about harassment, retaliation, and the negative impact the cut in Department-supported dedicated research time and the ECT assignment had on his research. Id. ¶ 56. None of Ms. Schrag, Dr. Emala, or Dr. Taylor responded to or took any action regarding Dr. Joshi's complaint. Id. ¶ 57. In or around December 2015, Dr. Joshi again complained to Ms. Schrag about Dr. Wood's not responding to his request for a joint appointment and change of title. Id. ¶ 58. Again, Ms. Schrag did not respond. Id. Dr. Joshi also spoke to Dr. David H. Strauss, Vice Chairman for Research Administration, Ethics and Policy and a member of the University's Conflict of Interest Committee and Co-Chair of the

University's Standing Committee on the Conduct of Science, about these matters. Id. Dr. Strauss also did not respond. Id. on January 7, 2016, Dr. Joshi complained of retaliation to Jeffrey L. Kestler, the University Compliance Officer. Id. ¶ 59. Mr. Kestler did not respond. Id.

On or around July 1, 2016, Dr. Wood retired as Chair of the Department and was replaced by Dr. Angsar Brambrink. Id. ¶ 62. At this time, Dr. Joshi applied for an open position as Chief of the Neuroanesthesia Division. Id. ¶ 64. Dr. Joshi had the widest clinical experience and publication record and was the best qualified of all applicants for this position. Id. However, Dr. Brambrink did not appoint Dr. Joshi and instead chose an interim Chief who spends little time in the Department. Id. Dr. Brambrink has not responded to Dr. Joshi's request for a joint appointment in the Neurosurgery Department and a title change to Associate Professor. Id. ¶ 65. Rather, Dr. Brambrink threatened to close down Dr. Joshi's lab at the end of 2017, citing funding concerns. Id. ¶ 66. Dr. Joshi alleges that this threat is unprecedented in the Department, and that several researchers who have been awarded less outside funding, or no outside funding at all, have been supported by the University. Id. ¶ 70. After Dr. Joshi filed this lawsuit, Dr. Brambrink told Dr. Joshi that Dr. Joshi's lab would not be shut down for an additional year. Id. ¶ 71.

The Research Misconduct Policy requires that an inquiry into alleged research misconduct be completed within 60 days. Id. ¶ 75. However, notwithstanding Dr. Joshi's formal complaint of research misconduct on April 3, 2015, the University did not initiate an investigation into the alleged misconduct until December 2015, and did not complete a draft report until December 5, 2016. Id. ¶¶ 74-76. While Dr. Joshi was permitted to comment on the draft report's recommendation, he was not allowed to see the full draft report, in apparent contravention of the Research Misconduct Policy, which provides that "the Complainant may comment on the draft Inquiry Report." Id. ¶¶ 76, 78.

## III.

### A.

The defendants move to dismiss the plaintiff's breach of contract claim, arguing that none of the Research Misconduct Policy, the Non-Retaliation Policy, or any of the statements by members of the University alleged by the plaintiff created a binding contract. The defendants argue further that, even if a contract was created, the plaintiff has not adequately alleged that the University breached it because none of the adverse actions alleged by the plaintiff constitute retaliation.

In the context of an employee's termination, "New York . . . recognize[s] an action for breach of contract when plaintiff can show that the employer made its employee aware of

an express written policy limiting the right of discharge and the employee detrimentally relied on that policy in accepting employment." Lobosco v. New York Tel. Co./NYNEX, 751 N.E.2d 462, 465 (N.Y. 2001) (citing Weiner v. McGraw-Hill, Inc., 443 N.E.2d 441 (N.Y. 1982)). The defendants contend that where an employee is not dismissed, however, "an employer's routinely-issued policies do not confer contractual rights on its employees" and that, in any event, the University's Reservation of Rights prevented the formation of a contract based on the Policies in this case. Defs.' Mot. Dismiss Am. Compl. 6.

New York cases make clear, however, that workplace policies — including those that govern a university's relationship with its faculty — can create binding contracts. For example, in O'Neill v. New York Univ., 944 N.Y.S.2d 503, 512-13 (App. Div. 2012), the Appellate Division, First Department, reinstated a professor's action against his university-employer for breach of contract based on retaliation, holding that the university's Code of Ethics, Code of Conduct, Non-Retaliation Policy, and Research Misconduct Policy, in combination, evidenced an express promise by the university not to retaliate against the professor for reporting research misconduct. Non-university employers may be equally held to the promises made to their employees in the manuals distributed to employees. See Mulder v. Donaldson, Lufkin & Jenrette, 623 N.Y.S.2d 560, 564 (App. Div. 1995)

("Thus, since this reporting requirement and reciprocal promise of protection in the manual impose an express limitation on the right of [the employer] to terminate employees who make such reports, plaintiff possesses a cause of action for breach of contract.").

The defendants argue that the situations in O'Neill and Mulder are distinguishable because they addressed the question whether the implied contracts prevented the employer from terminating the employee, rather than from taking the lessor retaliatory actions alleged by Dr. Joshi. But that is a distinction without a difference; the implied contracts in those cases prevented the terminations because they were a breach of the relevant agreement, just as Dr. Joshi alleges the retaliation against him was a breach of the agreement between the University and him. In any event, the Appellate Division, First Department, directly undercut the defendants' argument in Monaco v. New York Univ., 43 N.Y.S.3d 328, 329 (App. Div. 2016), where it held that "tenured faculty members of respondent New York University's School of Medicine, have sufficiently alleged that the policies contained in respondent's Faculty Handbook . . . have the force of contract[,]" in an action about the reduction of the faculty members' salaries.

O'Neill and Monaco, which recognized causes of action for breach of contract by university faculty members based on

statements within the universities' handbooks and policies, also undercut the defendants' argument that, as a matter of policy, "courts should not interpose themselves into the internal administration of education institutions." Defs.' Mot. Dismiss Am. Compl. 7. The defendants rely primarily on Maas v. Cornell Univ., 74 N.E.2d 966 (N.Y. 1999), in which the New York Court of Appeals held that in assessing the "employment relationship between the academic institution and its faculty member, we are satisfied that the University's adherence to its own internal procedures does not qualify for judicial cognizance[,]" explaining that "Courts retain a 'restricted role' in dealing with and reviewing controversies involving colleges and universities." Id. at 92 (citations omitted). However, the plaintiff in Maas alleged a breach of contract "[w]ithout reference to any express contractual source," referring generally to the university's failure to follow its own procedures. Id. Indeed, in Maas the Court of Appeals clarified that "[w]hen a complaint merely recites a litany of academic and administrative grievances couched in terms of a violation of a contractual right to tenure and is devoid of any reference to the contractual basis for the rights asserted, academic prerogatives should not be channeled into a cognizable contract action classification." Id. at 93. (internal quotation marks and citation omitted).

By contrast to the plaintiff in Maas, Dr. Joshi points to the specific provisions of the Research Misconduct Policy, which state that "the University shall ensure that . . . all reasonable and practical efforts are made to protect the Complainant from actual or potential retaliation[,]" Am. Compl. ¶ 20, and the Non-Retaliation Policy, which state that the University "expects members of the University community to inform the appropriate parties if they have observed unethical, illegal or suspicious activity," id. ¶ 27, among other statements in the Policies. Dr. Joshi's claim is more similar to the plaintiff's claim in O'Neill, where "the NYU Code of Ethics, the Code of Conduct, the Non-Retaliation Policy and the Research Misconduct Policies, in combination, include[d] NYU's express promise that it will protect employees from reprisal for reporting suspected research misconduct," O'Neill, 944 N.Y.Y.2d at 512-13, than to the plaintiff's claim in Maas. See Monaco 43 N.Y.S.3d at 329 (explaining that while "[a] university's academic and administrative decisions require professional judgment . . .[,]" (citing Mass, 94 N.Y.2d at 92), "if the claim involves a matter of contractual right it may, of course, be vindicated in an action at law." (internal quotation marks, brackets, and citation omitted).

The defendants also argue that the Reservation of Rights, which is linked to the online version of the Research Misconduct

Policy appended to the Faculty Handbook, which in turn is accessible through the University's website, prevents the formation of a binding contract. The Reservation of Rights provides, in relevant part, that "[t]he Handbook is not intended to and should not be regarded as a contract between the university and any faculty member or other person," and reserves the University's right to alter the Handbook. Wegrzyn Decl. Ex. C. The plaintiff argues that the Reservation of Rights refers only to the Faculty Handbook and not to the Research Misconduct Policy, and that, in any event, the specific language in the Research Misconduct Policy trumps the general language in the Reservation of Rights. The parties dispute whether the Non-Retaliation Policy contains or incorporates a disclaimer with substantially similar language.

In New York, conspicuous, clear disclaimers prevent the formation of an alleged implied contact. See Lobosco, 751 N.E.2d at 465 (dismissing claim based on breach of contract based on employee manual "because the explicit disclaimer of a contractual relationship contained on the facing page clearly preserve[ed the employer's] right to maintain an at-will employment relationship with plaintiff."); Baron v. Port Auth. of New York & New Jersey, 271 F.3d 81, 88 (2d Cir. 2001) (holding that under New York law "where a sufficiently unambiguous disclaimer, conspicuously placed in the employee

handbook such that the employee reasonably could be expected to read it is at issue . . . the implied contract claim may be dismissed as a matter of law.").

In this case there are disputed issues of fact with respect to the conspicuousness and clarity of the Reservation of Rights. First, the defendants argue that each of the Research Misconduct Policy and the Non-Retaliation Policy prominently "incorporates" a Reservation of Rights. Defs.' Reply 5. The plaintiff, however, contends that the Non-Retaliation Policy does not contain a Reservation of Rights at all, either within the four corners of the policy or by incorporation. This dispute hinges on whether a reservation of rights displayed on the University's Essential Policies website, which is substantially similar to the Reservation of Rights discussed above, pertains to the Non-Retaliation Policy, which is apparently accessible through the Essential Policies website and also through separate channels.

With respect to the Research Misconduct Policy, the plaintiff also contends that the Reservation of Rights, accessible as a link through the online version of the Faculty Handbook to which the Research Misconduct Policy is appended, is not conspicuous, but rather "is buried at the bottom of the eleventh page and outside the text of the policy itself . . . ." Pl.'s Opp'n 15. The plaintiff also argues that, by its terms,

the text of the Reservation of Rights applies to the Faculty Handbook and not to the Research Misconduct Policy. While the Research Misconduct Policy is attached to the online version of the Faculty Handbook as an appendix, it is not clear whether there is a standalone version of the policy as well, and, if so, whether that version contains the Reservation of Rights. It is thus unclear whether the disclaimer language at issue in this case is sufficiently clear and unambiguous like that in Baron, where the disclaimer was displayed at the front of the policy, id. at 85–86, or Lobosco, where the disclaimer was on the page facing the provision allegedly creating a contract, id. at 465.

The defendants also argue that, assuming a contract existed, the plaintiff has not pleaded that the defendants breached it. The thrust of the defendants' argument is that the adverse actions alleged by the plaintiff — cutting his Department-supported dedicated research time, singling him out for punitive assignments, ignoring his requests for a joint appointment, passing him over for a promotion for which he was the most qualified candidate, and threatening to terminate his laboratory — were not "retaliation" within the meaning of the Non-Retaliation Policy or the Research Misconduct Policy.

While the Research Misconduct Policy does not define retaliation, the Non-Retaliation Policy defines retaliation as follows:

> Retaliation is any action, statement, or behavior that
> is designed to punish an individual for filing a
> compliance report, cooperating with a compliance
> investigation, seeking guidance regarding a compliance
> concern or to deter one from taking such action.
> Retaliation includes, but is not limited to,
> intimidation, adverse action against an employee
> regarding the terms and conditions of employment, such
> as termination, demotion, or suspension, as well as
> related threats of such actions.

Wegrzyn Decl. Ex. B at 3. The defendants rely on Henry v. NYC

Health & Hosp. Corp., 18 F. Supp. 3d 396 (S.D.N.Y. 2014) and

Grant v. New York State Office for People with Developmental

Disabilities, No. 12-cv-4729, 2013 WL 3973168, at *10 (E.D.N.Y.

July 30, 2013) to show that courts have rejected allegations

that unfair or inferior work assignments were adverse employment

actions, but those cases dealt with Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e et seq.; 42 U.S.C. § 1981;

the New York State Human Rights Law, N.Y. Exec. Law § 290 et

seq.; the New York City Human Rights Law, N.Y. City Admin. Code

§ 8-101 et seq.; and the U.S. Constitution pursuant to 42 U.S.C.

§ 1983. By contrast, Dr. Joshi's claim is that the University

retaliated against him in breach of an implied contract. Whether

the alleged actions constituted "intimidation" or "adverse

action regarding the terms and conditions of employment" within

the meaning of the Non-Retaliation Policy, and whether any of

the actions alleged by Dr. Joshi were "designed to punish" him

for complaining about the Faculty Member's research misconduct,

are issues of fact that cannot be determined on a motion to dismiss.

Because the plaintiff has pleaded a claim for breach of contract based on the Research Misconduct Policy and the Non-Retaliation Policy, and because there are issues of fact with respect to the prominence and clarity of the disclaimer language at issue and the applicability of the Policies to the adverse actions alleged, the defendants' motion to dismiss the plaintiff's breach of contract claim is **denied.**[2]

### B.

The defendants move to dismiss the plaintiff's claim for breach of the covenant of good faith and fair dealing, arguing that it is duplicative of the plaintiff's breach of contract claim. The plaintiff argues that his good faith claim relates to conduct separate from that alleged in his breach of contract claim: while the breach of contract claim relates to retaliation, he argues, the good faith claim relates to the University's failure to meet the investigation deadlines in its policies and to failing to stop the retaliation once the plaintiff reported it.

---

[2] Because of this disposition, it is not necessary to reach the plaintiff's argument that the defendants' representations that they complied with federal law bound them to the Policies and rendered any disclaimer language ineffective.

"Implied in every contract is a covenant of good faith and fair dealing, which is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement." Jaffe v. Paramount Commc'ns Inc., 644 N.Y.S.2d 43, 47 (App. Div. 1996) (citing Rowe v. Great Atlantic & Pacific Tea Co., 385 N.E.2d 566 (N.Y. 1978)). "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." Harris v. Provident Life & Acc. Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002). However, where an allegation of a violation of the covenant of good faith and fair dealing alleges separate conduct from that underlying a concurrent claim for breach of contract, the two claims are not duplicative. See Travelsavers Enterprises, Inc. v. Analog Analytics, Inc., 53 N.Y.S.3d 99, 104 (App. Div. 2017); Elmhurst Dairy, Inc. v. Bartlett Dairy, Inc., 949 N.Y.S.2d 115, 118 (App. Div. 2012).

In the Amended Complaint, the plaintiff alleges that "Columbia has not fulfilled its obligations under its policies to investigate and not to retaliate," id. ¶ 98, and that "Columbia not only retaliated against Dr. Joshi, but it also failed to stop the retaliation even after Dr. Joshi complained

of it," id. ¶ 102. These failures to act, the plaintiff alleges, were "calculated to dissuade Dr. Joshi from pursuing his claim." Id. ¶ 99. While these alleged failures also relate to the subject matter of the Policies that the plaintiff alleges formed a binding agreement between the University and him, they are not based upon the same facts as the plaintiff's breach of contract claim. The plaintiff's breach of contract claim alleges primarily affirmative acts of retaliation by the University, while his claim for violation of the covenant of good faith and fair dealing alleges primarily failures of action by the University. Moreover, the plaintiff's breach of contract claim does not center on the University's failure to investigate promptly his claims of retaliation and to stop the retaliation, which allegation is the thrust of the plaintiff's claim for breach of the covenant of good faith and fair dealing.[3]

Because the plaintiff's good faith claim is not based upon the same facts as the plaintiff's breach of contract claim, the defendants' motion to dismiss this claim is **denied**.

## C.

The defendants argue that the plaintiff's claim for promissory estoppel fails because the plaintiff has not alleged

---

[3] On the other hand, it is unclear how the plaintiff was harmed by the University's alleged delay in investigating the plaintiff's claims of research misconduct by his colleague.

unconscionable injury, because New York courts do not recognize promissory estoppel in the "employment context," and because the plaintiff could not have reasonably relied on the alleged promises in light of the disclaimer language discussed above. Defs.' Mot. Dismiss Am. Compl. 13 n.7. "A cause of action for promissory estoppel under New York law requires the plaintiff to prove three elements: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance." Kaye v. Grossman, 202 F.3d 611, 615 (2d Cir. 2000). Under New York law, the doctrine of promissory estoppel may be invoked in two situations: (1) to enforce a promise, absent consideration, where there has been detrimental reliance, see Restatement (Second) of Contracts § 90 (Am. Law Inst. 1981), and (2) to enforce a contract that would otherwise be barred by the Statute of Frauds, see Restatement (Second) of Contracts § 139 (Am. Law Inst. 1981). See Merex A.G. v. Fairchild Weston Sys., Inc., 29 F.3d 821, 824 (2d Cir. 1994); Swerdloff v. Mobil Oil Corp., 427 N.Y.S.2d 266, 268-69 (App. Div. 1980). In this case, the plaintiff seeks to enforce a promise allegedly made in writing, in the Policies, and thus invokes the doctrine under the first theory.

First, the defendants contend that, under New York law, invoking the doctrine of promissory estoppel requires a

plaintiff to allege unconscionable injury. The New York Court of
Appeals recently clarified that unconscionable injury is a
required element of the second type of promissory estoppel
claim, where a party seeks to enforce an unwritten promise that
would otherwise be barred by the Statute of Frauds. In re Estate
of Hennel, 80 N.E.3d 1017, 1022 & n.3 (N.Y. 2017). However, the
New York Court of Appeals left open whether the other type of
promissory estoppel claim, that seeking to enforce a promise
absent consideration that has induced detrimental reliance,
carries the same requirement. Id. ("We also address on this
appeal the doctrine of promissory estoppel only insofar as it is
used to estop reliance on the statute of frauds. We do not
address the use of promissory estoppel in other contexts in
which the statute of frauds is not involved." (citing
Restatement (Second) of Contracts § 90; Swerdloff, 427 N.Y.S.2d
266; Merex A.G., 29 F.3d at 824-825.)). The cases cited by the
defendants for the requirement of unconscionable injury do not
suggest otherwise. See Philo Smith & Co. v. USLIFE Corp., 554
F.2d 34, 35 (2d Cir. 1977) (analyzing promissory estoppel in the
context of the Statute of Frauds); Kant v. Columbia Univ., No.
08-cv-7476, 2010 WL 807442, at *3-4 (S.D.N.Y. Mar. 9, 2010)
(same); Sea Trade Co. v. FleetBoston Fin. Corp., No.
03-cv-10254, 2004 WL 2029399, at *4 (S.D.N.Y. Sept. 9, 2004)
(same); Mobile Data Shred, Inc. v. United Bank of Switzerland,

No. 99-cv-10315, 2000 WL 351516, at *3-4 (S.D.N.Y. Apr. 5, 2000)
(same).[4]

Moreover, Swerdloff, one of the cases cited by the New York
Court of Appeals in In re Estate of Hennel, explains that "'the
requirement of consideration is more easily displaced than the
requirement of a writing,'" suggesting that New York's
requirement of unconscionable injury may be less justified where
promissory estoppel is applied to negate the requirement of
consideration, rather than to circumvent the Statute of Frauds.
Swerdloff, 427 N.Y.S.2d at 269 (quoting Restatement (Second) of
Contracts § 139 cmt. b (Am. Law Inst. 1981)). In any event, the
Court could not conclude on a motion to dismiss that the harm
the plaintiff alleges — derailing his career advancement and
stifling his "cutting-edge research" — is not "unconscionable."
Pl.'s Opp'n 19.

---

[4] In the one New York case cited by the defendants holding
that unconscionable injury is a required element for a claim for
promissory estoppel based on detrimental reliance, AHA Sales,
Inc. v. Creative Bath Prod., Inc., 867 N.Y.S.2d 169, 181 (App.
Div. 2008), the Appellate Division, Second Department, relied on
D & N Boening, Inc. v. Kirsch Beverages, Inc., 472 N.E.2d 992
(N.Y. 1984) and Dunn v. B & H Assocs., 743 N.Y.S.2d 546 (App.
Div. 2002). D & N Boening involved an issue of the Statute of
Frauds, and Dunn involved an alleged oral promise and relied on
other Appellate Division cases where the issue was circumvention
of the Statute of Frauds. See Greenbaum v. Weinstein, 515
N.Y.S.2d 866 (App. Div. 1987); Gold v. Vitucci, 563 N.Y.S.2d 443
(App. Div. 1990); Shapiro v. Shorenstein, 551 N.Y.S.2d 535 (App.
Div. 1990); Carvel Corp. v. Nicolini, 535 N.Y.S.2d 379 (App.
Div. 1988).

The defendants' argument that the plaintiff cannot state a claim for promissory estoppel because the plaintiff's claim arose in the "employment context" is also not correct. First, while the defendants cite two cases from the Southern District of New York to support this contention, subsequent courts in this District that have analyzed the question have been unable to identify any direct support from New York state courts. See Baguer v. Spanish Broad. Sys., Inc., No. 04-cv-8393, 2007 WL 2780390, at *6 (S.D.N.Y. Sept. 20, 2007) (stating that "this Court is aware of no New York State case that has similarly adopted a categorical rejection of promissory estoppel in the employment context," though recognizing that losing or failing to change employment is insufficient to satisfy the unconscionable injury required to circumvent the Statute of Frauds). The plaintiff does not invoke promissory estoppel to seek reinstatement of his employment or benefits, but rather complains of the University's retaliation, which has stifled his "cutting-edge research." It would therefore not be appropriate to dismiss the plaintiff's cause of action for promissory estoppel simply because the plaintiff and defendant have an employment relationship.

The defendants also argue that the plaintiff has not alleged adequately that, in light of the disclaimer language, the University's promises were clear and unambiguous, such that

the plaintiff's reliance upon them was reasonably foreseeable. However, there is a factual dispute over the placement and clarity of the disclaimer language, and the plaintiff has adequately pleaded that the University made clear promises upon which, absent any disclaimer language, it should have expected him to rely. For example, the plaintiff alleges that the Research Misconduct Policy states that "the University shall ensure that the Complainant is treated fairly and reasonably; all reasonable and practical efforts are made to protect the Complainant from actual or potential retaliation; [and] diligent efforts are made to protect or restore the position and reputation of the Complainant." Id. ¶ 20. Plainly, a promise that the University shall ensure that practical efforts are made to protect those who report research misconduct, absent the disputed disclaimer language, is clear enough that reliance by a reporter of research misconduct is reasonably foreseeable.

Therefore, the defendants' motion to dismiss the plaintiff's claim for promissory estoppel is **denied**.

### D.

The plaintiff's fourth claim is for fraud in the inducement. "To state a claim for fraud in the inducement, the party must allege: (i) a material misrepresentation of a presently existing or past fact; (ii) an intent to deceive; (iii) reasonable reliance on the misrepresentation by

27

appellants; and (iv) resulting damages." Johnson v. Nextel
Commc'ns, Inc., 660 F.3d 131, 143 (2d Cir. 2011) (citing Ross v.
Louise Wise Servs., Inc., 868 N.E.2d 189 (N.Y. 2007)). In
federal court, claims for fraud in the inducement are subject to
the heightened pleading standard under Federal Rule of Civil
Procedure 9(b), which requires that "the plaintiff must: (1)
specify the statements that the plaintiff contends were
fraudulent, (2) identify the speaker, (3) state where and when
the statements were made, and (4) explain why the statements
were fraudulent." McCormack v. IBM, 145 F. Supp. 3d 258, 268
(S.D.N.Y. 2015) (internal quotation marks omitted). The
defendants move to dismiss this claim, arguing that the
plaintiff has failed to allege justifiable reliance, fraudulent
intent by the University, or cognizable damages.

In this case, the plaintiff has not adequately alleged that
the University acted with an intent to deceive. The Court of
Appeals for the Second Circuit has explained that "to serve the
purposes of Rule 9(b), we require plaintiffs to allege facts
that give rise to a strong inference of fraudulent intent."
Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir.
1994). The thrust of the plaintiff's fraud-based claim is that
Ms. Schrag "knew that Columbia believed its Research Misconduct
and Non-Retaliation Policies were non-binding and unenforceable,
yet failed to disclose this belief and tacit policy to Dr.

28

Joshi." Am. Compl. ¶ 124. But the plaintiff does not allege that Ms. Schrag's intent to conceal the University's belief that the policies were non-binding had any bearing on the actual statements by the University on which the plaintiff claims he relied. That is, the plaintiff claims to have relied on the Policies, not on Ms. Schrag's silence on the non-binding nature thereof, which were made only after the plaintiff's reliance. Moreover, the plaintiff has alleged no facts to indicate that the University did not intend to comply with the Policies when the Policies were promulgated.

Because the plaintiff has failed to plead adequately that the University made the allegedly false statements on which he relied with an intent to deceive, the defendants' motion to dismiss the plaintiff's claim for fraud in the inducement is **granted.**[5]

## E.

The defendants also move to dismiss the plaintiff's fifth cause of action alleging a violation of New York's Not-For-Profit Corporation Law § 715-b. The defendants argue that Section 715-b does not imply a private right of action, and, assuming that it does, that the plaintiff has not alleged that the defendants violated that provision.

---

[5] It is therefore unnecessary to address the defendants' additional arguments in favor of dismissing this claim.

Section 715-b(a) provides, in relevant part that:

> the board of every corporation that has twenty or more
> employees and in the prior fiscal year had annual revenue
> in excess of one million dollars shall adopt, and oversee
> the   implementation   of,   and   compliance   with,   a
> whistleblower policy to protect from retaliation persons
> who report suspected improper conduct. Such policy shall
> provide that no director, officer, employee or volunteer
> of a corporation who in good faith reports any action or
> suspected action taken by or within the corporation that
> is illegal, fraudulent or in violation of any adopted
> policy of the corporation shall suffer intimidation,
> harassment, discrimination or other retaliation or, in
> the case of employees, adverse employment consequence.

N.Y. Not-for-Profit Corp. Law § 715-b(a) (emphasis added). The

defendants do not dispute that Section 715-b applies to the

University. The plaintiff concedes that Section 715-b does not

contain an express private right of action for employees of

not-for-profit corporations who report suspected improper

conduct and are the subject of retaliation.

Absent an express private right of action, a plaintiff can

maintain a plenary action based on the violation of a statute

"only if a legislative intent to create such a right of action

is fairly implied in the statutory provisions and their

legislative history." Cruz v. TD Bank, N.A., 2 N.E.3d 221, 226

(N.Y. 2013) (internal quotation marks and citation omitted). As

the New York Court of Appeals explained in Cruz, the

determination of such legislative intent is based on three

factors: "(1) whether the plaintiff is one of the class for

whose particular benefit the statute was enacted; (2) whether

recognition of a private right of action would promote the legislative purpose; and (3) whether creation of such a right would be consistent with the legislative scheme." Id. (internal quotation marks and citation omitted). The third factor is the most important because "the Legislature has both the right and the authority to select the methods to be used in effectuating its goals, as well as to choose the goals themselves." Id. (internal quotation marks omitted).

There is disagreement within the New York State Supreme Court over whether Section 715-b implicitly provides a private right of action. In Della Pietra v. Poly Prep Country Day Sch., Index No. 506586/2015 (Sup. Ct. Kings Cty. Oct. 1, 2016), the court found that all three factors necessary to create a private right of action had been met. Id. at 5-7. With respect to the first two factors, the court explained that the statutory language made clear that whistleblowers who complain of retaliation were "clearly in the class of people the statute intended to protect," id. at 5, and that recognition of a private right of action would promote the purpose of protecting whistleblowers, id. at 6. With respect to the third factor, the court reasoned that, while Section 720 of the statute gives the attorney general authority to commence actions for violations of Sections 719 and 720, it was silent as to Section 715-b(a). Id. Because it found that Section 715-b affords rights to

31

individuals, the court found that a private right of action was consistent with the legislative scheme. Id. at 7.

However, Ferris v. Lustgarten Found., 2017 N.Y. Misc. LEXIS 3234, *5-6 (Sup. Ct. Nassau County Jan. 17, 2017) declined to recognize a private right of action for a whistleblower claiming retaliation under Section 715-b. Like Della Pietra, Ferris held that the first and second factors were met. However, Ferris determined that the third factor was not met, reasoning that because Section 112(a)(7) of the Not-For-Profit Corporation Law "authorizes the attorney general to maintain an action to enforce any right given under the Not-for-Profit Corporation Law to members, a director, or an officer of a charitable corporation[,] . . . the Legislature presumably intended for the attorney general to be authorized to enforce the Whistleblower policy statute." Ferris, 2017 N.Y. Misc. LEXIS 3234 at *5.

The reasoning in Ferris with respect to the third factor is not persuasive. Section 112(a)(7) provides that the attorney general may:

> enforce any right given under this chapter to members, a director or an officer of a charitable corporation. The attorney-general shall have the same status as such members, director or officer.

N.Y. Not-for-Profit Corp. Law § 112(a)(7). Thus, Section 112(a)(7) speaks only to the attorney general's protection of the rights of members, directors, or officers of not-for-profit

corporations, none of which describe the plaintiff in this case, who alleges that he is an employee of the University.

By contrast to Section 112(a)(7), which authorizes the attorney general to enforce the rights of members, directors, and officers of not-for-profit corporations, Sections 715-b(a), at issue in this case, prescribes protections for "director[s], officer[s], employee[s] or volunteer[s]" of not-for-profit corporations. Id. § 715-b(a). Both Della Pietra and Ferris recognized that Section 715-b(a) was designed to protect employees of not-for-profit corporations. See Della Pietra, Index No. 506586/2015 at 5 ("Plaintiff therefore, as a former employee, is clearly in the class of people the statute intended to protect."); Ferris 2017 N.Y. Misc. LEXIS 3234 at *4 ("As an employee of a not-for-profit corporation who reported suspected improper conduct, plaintiff is a member of the class for whose benefit Not-For-Profit Corporation Law § 715-b was enacted."). Therefore, the basis on which Ferris decided that Section 715-b(a) did not imply a private right of action for employees — that Section 112(a)(7) provides a conflicting enforcement mechanism for employees' rights under that provision — is unpersuasive. Pending further guidance from the New York State courts, it appears that Section 715-b(a) has created a private right of action for employees of not-for-profit corporations.

The defendants' other argument, that the plaintiff has not

pleaded that the University violated Section 715-b(a) is

unavailing. The relevant portion of the statute provides that:

> the board of every corporation . . . shall adopt, and
> oversee the implementation of, and compliance with, a
> whistleblower policy to protect from retaliation persons
> who report suspected improper conduct.

N.Y. Not-for-Profit Corp. Law § 715-b(a). The essence of the

Amended Complaint alleges that the University did not comply

with the Research Misconduct Policy or the Non-Retaliation

Policy by allowing retaliation against the plaintiff for

reporting improper conduct. The allegation is that the board

failed to oversee compliance with the requisite whistleblower

policy and that the plaintiff was harmed as a result.[6]

---

[6] Section 715-b(b) of the statute provides a series of required
provisions that must be included in a whistleblower policy. N.Y.
Not-for-Profit Corp. Law § 715-b(b). Section 715-b(c) of the
statute provides: "A corporation that has adopted and possesses
a whistleblower policy pursuant to federal, state or local laws
that is substantially consistent with the provisions of
paragraph (b) of this section shall be deemed in compliance with
provisions of this section." N.Y. Not-for-Profit Corp. Law
§ 715-b(c). The defendants argue that there could be no
violation of this statute because they adopted a whistleblower
policy that was consistent with federal law and therefore, by
definition, they were "deemed in compliance with the provisions
of this section." That is not the most reasonable interpretation
of a somewhat ambiguous statute. The more reasonable
interpretation is that the board is required to "adopt, and
oversee the implementation of, and compliance with" a
whistleblower policy. While adoption of a federally compliant
policy may satisfy the adoption obligation, it does not absolve
the board of its continuing statutory obligations to oversee the
implementation of and compliance with the policy.

Therefore, the defendants' motion to dismiss the plaintiff's cause of action under New York's Not-For-Profit Corporation Law § 715-b is **denied**.

## CONCLUSION

The Court has considered all the parties' arguments. To the extent any arguments are not specifically addressed above, they are either moot or without merit. The defendants' motion to dismiss the Amended Complaint is **granted in part and denied in part**. The Clerk of Court is directed to close all pending motions.


**SO ORDERED.**

**Dated:**   **New York, New York**
            **May 28 2018**

_____
John G. Koeltl
United States District Judge