**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
────────────────────────────────

**SHAILENDRA JOSHI,**

                    **Plaintiff,**

            **- against –**

**THE TRUSTEES OF COLUMBIA UNIVERSITY**
**IN THE CITY OF NEW YORK, COLUMBIA**
**UNIVERSITY IN THE CITY OF NEW YORK,**
**and COLUMBIA UNIVSERSITY COLLEGE OF**
**PHYSICIANS AND SURGEONS,**

                    **Defendants.**
────────────────────────────────

**17-cv-4112 (JGK)**

**MEMORANDUM OPINION AND**
**ORDER**

**JOHN G. KOELTL, District Judge:**

        Dr. Shailendra Joshi, an anesthesiologist at Columbia
University College of Physicians and Surgeons ("CUCPS"), an
affiliate of Columbia University in the City of New York (the
"University"), brings this action against CUCPS, the University,
and the Trustees of the University (together with CUCPS and the
University, the "defendants").  Dr. Joshi has conducted research
at the University for over 25 years.  However, due to a lapse in
external funding, the defendants seek to close Dr. Joshi's lab.
Dr. Joshi moved for a preliminary injunction and temporary
restraining order to keep his lab open.  Dr. Joshi claims that
the closing of his lab is in retaliation for his complaints
about the alleged professional misconduct by a colleague and
this retaliation violates Dr. Joshi's contractual, statutory and
other rights. This Court denied the motion for a temporary

restraining order on July 23, 2020.  Because Dr. Joshi failed to
make a showing of irreparable harm, sufficiently serious
questions on the merits, that the balance of hardships decidedly
tips in his favor, and that a preliminary injunction is in the
public interest, the motion is **denied**.

## I.  Background

Dr. Joshi, an anesthesiologist in the Neuroanesthesia
Division of the University's Department of Anesthesiology (the
"Department"), as well as an Assistant Professor of
Anesthesiology in CUCPS, has been a faculty member of the
University since 1997.  Am. Compl. ¶ 7.  During his time at the
University, Dr. Joshi authored over 60 scientific papers and
numerous book chapters.  Id. ¶ 8.  He also has given over 150
scientific presentations and served as a member of the Editorial
Board of the Journal of Neuroanesthesiology.  Id. ¶¶ 8-9.  Dr.
Joshi focused his research on mechanisms for delivering drugs to
the brain in patients with brain tumors.  Id. ¶ 10.  The
University has given Dr. Joshi two awards for his research, id.
¶¶ 11-12, and the National Institute of Health (the "NIH") has
awarded him several grants to support his research.  Id. ¶¶ 10,
13.  More recently, Dr. Joshi researched the possibility of
developing a new ventilator and ventilator pump that could be
useful in treating COVID-19 patients.  Joshi Decl. ¶ 11.

Despite his research, Dr. Joshi has had several conflicts with the defendants.  In or around December 2014, Dr. Joshi suspected that a research article authored by a senior faculty member of the Department contained inaccurate, falsified, or fabricated data.  Am. Compl. ¶ 14.  Dr. Joshi discussed his concerns with the author, his colleagues in the Neuroanesthesia Division of the Department, and the Vice Chair for Departmental Research, Dr. Charles Emala.  Id. ¶¶ 33-34.  On April 3, 2015, Dr. Joshi filed a formal complaint of research misconduct with the Associate Vice-President of the University's Office of Executive Vice-President for Research, Naomi Schrag.  Id. ¶ 35.

After Dr. Joshi raised his concerns, the Department reduced Dr. Joshi's Department-supported research time.  Id. ¶ 43.  The Department regularly allotted Dr. Joshi the least amount of Department-supported dedicated research time of any member of the Department.  Id. ¶ 44.  Dr. Joshi believes this was done as retaliation for his past report of research misconduct.  Id. ¶¶ 42-44.

In August 2015, Dr. Joshi complained to Ms. Schrag, Dr. Emala, and Dr. Anne Taylor, the Senior Vice-President for Faculty Affairs and Career Development at the University, about harassment, retaliation, and the reduction in Department-supported dedicated research time.  Id. ¶ 56.  According to Dr. Joshi, they did not respond to his complaint.  Id. ¶ 57.  In or

3

around December 2015, Dr. Joshi complained to Ms. Schrag that
Dr. Wood, the former Chair of the Anesthesiology Department, did
not respond to Dr. Joshi's request for a joint appointment to
the Neurosurgery Department and change of title to Associate
Professor.  Id. ¶¶ 52, 58.  Dr. Joshi asserts that Ms. Schrag
did not respond to his complaint.  Id. ¶ 58.  Dr. Joshi also
discussed his concerns with Dr. David H. Strauss, the Vice
Chairman for Research Administration, Ethics and Policy and a
member of the University's Conflict of Interest Committee and
Co-Chair of the University's Standing Committee on the Conduct
of Science, who likewise did not respond.  Id.

     In addition to conflicts with the Department and CUCPS
leadership, Dr. Joshi also had issues with his lab technician.
In June 2020, Johann Cooke, who worked in Dr. Joshi's lab for
approximately six years, complained to the Medical School's
human resources department that Dr. Joshi was harassing him.
Joshi Decl. ¶ 13.  Mr. Cooke was not the first individual to
complain about Dr. Joshi's harassment.  Id.  The conflict
between Dr. Joshi and Mr. Cooke arose from Dr. Joshi's demand
that Mr. Cooke travel to the lab or to Dr. Joshi's home, despite
the University and state-wide stay-at-home mandates in place to
protect individuals and the community from the spread of COVID-
19.  Wegrzyn Decl. ¶¶ 3-5, Exs. B-D; Brambrink Decl. ¶ 14.  As a
result of this conflict, Mr. Cooke brought the matter to the

4

Medical School's human resources department.  Wegrzyn Decl.
¶¶ 3-5, Exs. B-D; Joshi Decl. ¶ 13.  After the human resources
department referred the matter back to the Department, Dr. Emala
agreed to mediate future disputes.  Brambrink Decl. ¶ 14.
Despite the alleged harassment, Mr. Cooke remains available to
assist Dr. Joshi in the final analysis and organization of data
from his lab.  Id. ¶ 15.

Due to his conflicts with the Department, starting with his
2015 complaint of research misconduct, Dr. Joshi believes that
the defendants undertook a series of retaliatory actions,
including the decision to close his lab.  Dr. Joshi alleged that
the retaliatory intent harbored by certain members in the
Department transferred to other members of the Department, even
to those who were not employed by the University at the time of
Dr. Joshi's 2015 complaint of research misconduct.  For example,
in July 2016, Dr. Wood retired as Chair of the Department and
was replaced by Dr. Angsar Brambrink, who was not employed by
the University prior to July 2016.  Am. Compl. ¶ 62; Brambrink
Decl. ¶ 2.  Dr. Brambrink, not Dr. Wood, made the decision to
close Dr. Joshi's lab.  Dr. Joshi's research misconduct
allegations, which he claims were the impetus for the
defendants' allegedly retaliatory conduct, occurred over a year-
and-a-half prior to Dr. Brambrink's employment at the
University.  Brambrink Decl. ¶ 13; Joshi Decl. ¶ 3.

The defendants, on the other hand, assert that the
Department's decision to close Dr. Joshi's lab was due to a lack
of external funding.  Dr. Brambrink, citing funding concerns,
first threatened to close Dr. Joshi's lab by the end of July
2017 because Dr. Joshi's lab would not have external funding.
Am. Compl. ¶ 66.  Researchers in the Department fund their labs
with a mix of Departmental and external funding.  See Brambrink
Decl. ¶¶ 3-4.  External funding can be secured from a variety of
grant-giving bodies, such as the NIH.  Id.  In the absence of
external funding, the Department must pay for the expenses out
of its limited budget.  Id.  Because grants are competitive, the
Department makes available "bridge funding" to give faculty an
opportunity to secure new funding when prior funding lapses.  Id.
¶ 6.  Customary Department procedure is to provide two years of
bridge funding when a researcher loses external funding.  Joshi
Reply Decl. ¶ 10, Ex. G.  Researchers in the Department
typically choose to close their labs voluntarily when they lose
external funding and exhaust all bridge funding.  Brambrink
Decl. ¶ 12.  The Department recently witnessed two such
voluntary closures.  Id.  Notwithstanding the typical practice
of providing two years of bridge funding, the Department
provided bridge funds to Dr. Joshi for over three years since
his external funding expired in March 2017.  Brambrink Decl.
¶¶ 6-7.

6

Dr. Joshi's lab has a sizable budget.  It costs the
Department approximately $21,000 per month, consisting of the
cost of renting the space from the University, Mr. Cooke's
compensation, lab supplies, and Dr. Joshi's nonclinical time.
Brambrink Decl. ¶ 3.  Since March 2017, the only financial
support for Dr. Joshi's lab has been provided by the Department,
id. ¶ 6; Wegrzyn Decl. ¶ 2, Ex. A, but since 2018, the
Department limited its support for Dr. Joshi's lab by purchasing
fewer new supplies for his lab.  Joshi Decl. ¶ 5.

Dr. Joshi's past external funding included a K08 NIH grant
that provided funding from March 2001 to February 2006, and then
two R01 NIH grants, that provided funding from September 2008 to
July 2014, and April 2011 to March 2017.  Wegrzyn Decl. ¶ 2,
Ex. A.  After 2013, Dr. Joshi has made at least seven
unsuccessful grant applications to the NIH.  Id. ¶¶ 2, 6, Exs.
A, E.  Dr. Joshi also sought external funding from hospitals and
pharmaceutical companies.  In February 2020, Dr. Joshi applied
for research funding through the New York-Presbyterian Hospital
William Rhodes Center for Glioblastoma Collaborative Research
Initiative, but he has yet to secure that funding.  Joshi Decl.
¶ 10.  Dr. Joshi has also discussed the possibility of receiving
funding from pharmaceutical companies, but likewise has not yet
secured funding from those sources.  Id. ¶ 9.  Although Dr.
Joshi intends to submit another grant application for NIH

7

funding in October 2020, even if successful, such funds would not be disbursed until July 2021 or later.  Brambrink Decl. ¶ 10.

According to the defendants, because Dr. Joshi has failed to secure external funding, the Department decided to close his lab as of June 30, 2020.  Id. ¶¶ 7-9.  The Department has not removed Dr. Joshi's equipment or denied him access to the lab. Id. ¶ 9.  Even though the Department considers the lab closed, Mr. Cooke remains available to assist Dr. Joshi, and the Department agreed to provide Mr. Cooke with four months of funding after the closure of Dr. Joshi's lab so that Mr. Cooke could assist with the final analysis and organization of Dr. Joshi's research.  Id. ¶¶ 7, 15, Ex. A.

Even though Dr. Joshi currently has access to his lab, he alleges that he will be irreparably harmed if the Department moves his equipment into storage.  Joshi Decl. ¶ 20.  Dr. Joshi has carefully acquired and calibrated the equipment in his lab throughout the last 25 years.  Id. ¶¶ 15-18.  Closing Dr. Joshi's lab would require dismantling such equipment and would cause the lab to lose its New York State certification for narcotic storage and use.  Id.  Nevertheless, the Department committed to "storing [Dr. Joshi's] research equipment and re-opening [his] laboratory at a later date should external research funding be established." Brambrink Decl. ¶¶ 7-8, Ex. A.

8

Moreover, Dr. Joshi's lab would not be the only lab to have equipment disassembled and moved, because the Department is currently relocating the labs of five researchers into a new space.  Id. ¶ 11.

Dr. Joshi has been aware that the Department threatened to close his lab since at least the filing of the Complaint in 2017.  Compl. ¶ 49.  In December 2019, Dr. Emala and Dr. Brambrink informed Dr. Joshi that his lab would close on June 30, 2020 if he could not obtain external funding by March 31, 2020.  Brambrink Decl. ¶ 7.  On June 17, 2020, Dr. Emala and Dr. Brambrink confirmed to Dr. Joshi that his lab would close on June 30, 2020 because he had not received external funding by the March 31, 2020 deadline.  Id. ¶ 8.  Dr. Joshi brought this Motion for a Preliminary Injunction on July 22, 2020.

## II.  Preliminary Injunction

A preliminary injunction "is one of the most drastic tools in the arsenal of judicial remedies," Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (citation omitted), and it "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (internal quotation marks, emphasis, and citation omitted).  "A party seeking a preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on

the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest."[1]  N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc., 883 F.3d 32, 37 (2d Cir. 2018).  A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted).

### A.  Irreparable Harm

Dr. Joshi has not shown that he would be irreparably harmed by the closure of his lab.  The Department offered to move his equipment into storage, and he could reopen his lab were he to secure external funding.  Although Dr. Joshi alleged that his equipment would not be functional after being moved, other researchers must move their equipment for various reasons, and the Department is currently moving the labs of several other faculty members.  Moreover, Dr. Joshi's delay in bringing his

---

[1] The parties dispute whether this motion involves a prohibitory or mandatory injunction.  Dr. Joshi currently has access to and use of his lab.  Therefore, the injunction here is a prohibitory injunction.  However, because Dr. Joshi failed to meet the standard required for a prohibitory injunction, he likewise failed to meet the heighted legal standard required for a mandatory injunction.  See N. Am. Soccer League, 883 F.3d at 37 ("Because mandatory injunctions disrupt the status quo, a party seeking one must meet a heightened legal standard by showing 'a clear or substantial likelihood of success on the merits.'") (quoting N.Y. Civil Liberties Union v. N.Y.C. Transit Auth., 684 F.3d 286, 294 (2d Cir. 2012)).

motion for preliminary injunction rebuts his argument that closure of the lab, which had been threatened multiple times beginning about three years before Dr. Joshi brought this motion, would cause him irreparable injury.

Dr. Joshi must establish that absent a preliminary injunction he would likely suffer "an injury that is neither remote nor speculative, but actual and imminent and one that cannot be remedied if a court waits until the end of trial to resolve the harm." Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 114 (2d Cir. 2005) (internal quotation marks and citation omitted).  Irreparable harm is "injury for which a monetary award cannot be adequate compensation." Jackson Dairy Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979) (per curiam).  In the context of a plaintiff's showing of likely irreparable injury, "[l]ikelihood sets, of course, a higher standard than 'possibility.'" JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 79 (2d Cir. 1990).

Dr. Joshi has undertaken considerable effort in establishing his lab in its current form.  He has acquired and calibrated his equipment over more than two decades while working in the Department.  His lab also is certified by New York State for narcotic storage and usage.  Such certification will be lost if his lab is closed.  Closure of Dr. Joshi's lab

11

would similarly thwart his current projects and may foreclose
certain future opportunities.

However, despite the inconvenience closing the lab might
cause Dr. Joshi, these harms are not irreparable.  Specifically,
the Department told Dr. Joshi that it would store his equipment
with hopes of reopening the lab if he were able to secure
external funding in the future.  While Dr. Joshi alleged that
moving the equipment would irreparably damage it, he failed to
show why, if he were able to assemble his equipment in the past,
he would not be able to reassemble it in the future were his lab
to reopen.  Dr. Joshi could likewise reapply for a New York
State certification for narcotic storage and usage were he able
to reopen his lab.  These consequences, though burdensome, are
remediable and insufficient to show irreparable injury.
Moreover, moving lab equipment is not unusual or even uncommon.
Currently, the Department is in the process of moving the labs
of five researchers into renovated spaces.  Dr. Joshi failed to
show why his equipment is so different from other equipment in
the Department that disassembling and moving his equipment would
uniquely cause irreparable injury when other researchers in the
same department commonly need to move their equipment.

Dr. Joshi's argument that closing the lab will stall his
current projects is similarly unpersuasive.  The Department
agreed to support his lab technician, Mr. Cooke, for four months

after the closing of the lab so that Mr. Cooke could assist with
the final organization and analysis to secure Dr. Joshi's
already-conducted research.  That Dr. Joshi cannot continue to
do new research is not an irreparable injury.  First, if he were
to obtain external funding, he could continue to do new
research.  Second, he maintains his employment in the
Department.  Courts have found that far more extreme employment
actions taken against professors do not constitute irreparable
harm.  See, e.g., Ahmad v. Long Island Univ., 18 F. Supp. 2d
245, 249 (E.D.N.Y. 1998) ("Significantly, he is a professional
who holds a doctorate and who evidently specializes in the
sophisticated field of stroke research and treatment.  With
reasonable certainty, he will continue to practice his learned
profession.  While the Court does not dispute the plaintiff's
suggestion that his loss of employment will occasion some loss
of reputation and interruption in his research and work, this
does not amount to 'irreparable harm.'").

Dr. Joshi's argument is further undermined by his delay in
bringing this motion.  Unreasonable delay may "preclude the
granting of preliminary injunctive relief, because the failure
to act sooner undercuts the sense of urgency that ordinarily
accompanies a motion for preliminary relief and suggests that
there is, in fact, no irreparable injury." Tough Traveler,
Ltd. v. Outbound Prods., 60 F.3d 964, 968 (2d Cir. 1995)

13

(internal quotations marks and citations omitted); see also
Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir.
1985)(delay in bringing a motion for preliminary injunction may
"indicate an absence of the kind of irreparable harm required to
support a preliminary injunction").  "[C]ourts typically decline
to grant preliminary injunctions in the face of unexplained
delays of more than two months." Gidatex, S.r.L. v. Campaniello
Imps., Ltd., 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998).  Indeed,
courts have denied preliminary injunctions for delays shorter
than here.  See, e.g., Weight Watchers Int'l, Inc. v. Luigino's,
Inc., 423 F.3d 137, 144 (2d Cir. 2005) ("We have found delays of
as little as ten weeks sufficient to defeat the presumption of
irreparable harm that is essential to the issuance of a
preliminary injunction."); Citibank., N.A., 756 F.2d at 276-77
(finding that a ten-week delay rebutted a finding of irreparable
injury); Ins. Co. of the State of Pennsylvania v. Lakeshore
Toltest JV, LLC, 15-CV-1436, 2015 WL 8488579 at *3 (S.D.N.Y.
Nov. 30, 2015) (finding a seven-month delay "undercuts a finding
of irreparable injury").

Dr. Joshi knew about the Department's plans to close his
lab since at least the time he filed this action over three
years ago.  Moreover, in December 2019, Dr. Brambrink and Dr.
Emala definitively told Dr. Joshi that his lab would be closed
effective June 30, 2020 if he could not obtain external funding

14

by March 31, 2020.  The lab's closure was reconfirmed on June 17, 2020.  However, Dr. Joshi did not bring this preliminary injunction motion  until July 22, 2020, seven months after being definitively told that his lab was to close on June 30, 2020 if he could not secure external funding, and over three years after he alleged that the Department was threatening to close his lab. Moreover, the defendants' representation that they would not move Dr. Joshi's equipment during the pendency of this motion, Defs. Br. at 6 n.3, does not excuse Dr. Joshi's unreasonable delay in bringing his preliminary injunction motion.

Therefore, Dr. Joshi has failed to show that, absent a preliminary injunction, he will suffer irreparable harm.

### B.  Merits

Dr. Joshi has not raised sufficiently serious questions going to the merits of his claims, namely that the decision to close Dr. Joshi's lab was retaliation for his complaints about a colleague's alleged misconduct.  The alleged retaliatory intent was attenuated, and the defendants presented clear funding-based motives for closing Dr. Joshi's lab.

Dr. Joshi must show "sufficiently serious questions going to the merits to make them a fair ground for litigation."  See Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 (2d Cir. 2010) (quoting Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d

Cir.1979)).[2]  Under this standard, a preliminary injunction may
be appropriate if a court "cannot determine with certainty that
the moving party is more likely than not to prevail on the
merits of the underlying claims, but where the costs outweigh
the benefits of not granting the injunction."  Id. at 35.
However, under this standard, a plaintiff's overall burden "is
no lighter than the one it bears under the 'likelihood of
success' standard" because the plaintiff "must not only show
that there are 'serious questions' going to the merits, but must
additionally establish that 'the balance of hardships tips
decidedly' in its favor."  Id. (citation and emphasis omitted).

Dr. Joshi's four remaining claims in this action are breach
of contract, breach of the covenant of good faith and fair
dealing, promissory estoppel, and a violation of New York's Not-
For-Profit Corporation Law § 715-b requiring adequate
whistleblower protections.  All of Dr. Joshi's claims require a
showing that the defendants took retaliatory actions or failed
to prevent retaliatory actions against Dr. Joshi.  Dr. Joshi's
breach of contract claim alleges that the defendants agreed to
"take all reasonable and practical efforts to protect Dr. Joshi
from potential or actual retaliation."  Am. Compl. ¶ 89.  His

---

[2] Because Dr. Joshi failed to show sufficiently serious questions
going to the merits of his claims, he likewise failed to satisfy
the more rigorous "likelihood of success on the merits"
standard.

breach of the covenant of good faith and fair dealing claim
alleges that the defendants did not fulfill their obligation "to
investigate and not to retaliate" and "to end the retaliation"
against him.  Id. ¶¶ 98, 100.  Dr. Joshi's promissory estoppel
claim alleges that the defendants promised, upon Dr. Joshi's
research misconduct complaint, "to protect [him] from potential
or actual retaliation."  Id. ¶ 107.  And his statutory
whistleblower claim asserts that "[the defendants'] retaliation
against plaintiff was and is in violation of its obligations
under Section 715-b."  Id. ¶ 134; see also N.Y. Not-For-Profit
Corp. Law § 715-b(a) (Boards of not-for-profit corporations
"shall adopt, and oversee the implementation of, and compliance
with, a whistleblower policy to protect from retaliation persons
who report suspected improper conduct").

However, Dr. Joshi has failed to raise sufficiently serious
questions about whether the defendants' decision to close Dr.
Joshi's lab was in retaliation for his report about a
colleague's alleged misconduct.  Dr. Joshi's underlying
allegation is that the defendants retaliated against him or
failed to prevent retaliation against him because of his
complaint of research misconduct in 2015 and subsequent
conflicts.  Particularly, he argues that after he raised his
concerns about research misconduct, then-Chair of the
Department, Dr. Wood, began taking retaliatory actions.  Soon

after Dr. Joshi's report of research misconduct, Dr. Wood raised
the possibility of closing Dr. Joshi's lab, even though Dr.
Joshi had funding for two more years.  However, Dr. Wood never
closed Dr. Joshi's lab.  And Dr. Joshi failed to show how any
potential retaliatory intent harbored by Dr. Wood transferred to
Dr. Brambrink, who actually made the decision to close the lab,
and who did not join the Department until over a year after Dr.
Joshi's allegation of research misconduct.  The timing of a
plaintiff's protected activity and a defendant's alleged
retaliation may be circumstantial evidence of the presence or
absence retaliatory motive. See Scheiner v. New York City Health
& Hosps., 152 F. Supp. 2d 487, 496 (S.D.N.Y. 2001); see also
Gorman-Bakos v. Cornell Co-op Extension, 252 F.3d 545, 554-55
(2d Cir. 2001) (collecting cases).  The passage of years after
his 2015 complaint, and the intervention of a new decision-maker
who decided to close Dr. Joshi's lab, undercut any argument that
the decision to close Dr. Joshi's lab was in retaliation for his
years' old complaint.

     Dr. Joshi also alleged, as proof of a retaliatory scheme,
that the Department tried to remove Mr. Cooke from Dr. Joshi's
lab.  However, the Department did not decide to remove Mr. Cooke
from Dr. Joshi's lab on its own.  Rather, Mr. Cooke sought the
intervention of the Medical School's human resource department
after he felt harassed by Dr. Joshi.  Mr. Cooke alleged that Dr.

Joshi falsely accused Mr. Cooke of refusing to work and demanded that Mr. Cooke go into the lab or to Dr. Joshi's home, even when Mr. Cooke expressed reservations about traveling in light of the COVID-19 pandemic and in violation of the University and state-wide stay-at-home mandates for non-essential workers.  Due to this conflict, it was Mr. Cooke who sought recourse from the Department, not an action initiated by the Department to retaliate against Dr. Joshi.  Moreover, Mr. Cooke has not been reassigned to another lab, as Dr. Joshi alleged, and the Department is continuing to support Mr. Cooke in his research. Mr. Cooke is available to assist Dr. Joshi with the final analysis and organization of data from Dr. Joshi's lab.

Dr. Joshi further alleged that it was unprecedented for the Department to close a lab due to a lapse in funding and that the Department's decision to close his lab signals retaliatory intent.  But researchers in the Department typically close their own labs voluntarily when they lose external funding and have exhausted bridge funding.  In fact, two faculty members in the Department recently closed their labs voluntarily due to a lack of funding.  Moreover, Dr. Brambrink confirmed that the Department would store Dr. Joshi's equipment with the hopes of reopening the lab were Dr. Joshi successful in obtaining external funding, which further rebuts Dr. Joshi's claim of retaliation.

Instead, the defendants make a persuasive showing that the decision to close Dr. Joshi's lab was motivated by funding concerns. Contrary to Dr. Joshi's allegations of retaliation, the Department had legitimate budgetary reasons to close Dr. Joshi's lab.  Dr. Joshi had external funding until March 2017. External funding helps defray the approximately $21,000 per month required to keep Dr. Joshi's lab operational.  After Dr. Joshi's funding lapsed in 2017, the Department provided bridge funding so that Dr. Joshi could continue in his lab until he found external funding.  The Department has provided over three years of bridge funding, even though typical practice is to provide no more than two years of bridge funding.  While the bridge funding was less than what Dr. Joshi was receiving from external grants, the Department acted reasonably in supplying Dr. Joshi with the funds necessary to continue his lab's operations while he pursued other external funding opportunities.  The purpose of the bridge funding was to keep Dr. Joshi's lab operational while he secured other funding, not to support it indefinitely.

During the three years the Department provided Dr. Joshi with bridge funding, Dr. Joshi failed to secure external funding despite at least seven NIH grant proposals since his last R01 grant was funded in 2011 and lapsed in 2017.  Dr. Joshi received longer bridge funding than is customary, and the Department

20

warned him that the lab would close if he were unable to secure external funding. The Department provided reasonable non-retaliatory reasons for closing Dr. Joshi's lab.  Therefore, Dr. Joshi has not raised sufficiently serious questions regarding alleged retaliation in closing his lab.

### C. Balance of Hardships

The balance of hardships tips in favor of the defendants, making a preliminary injunction inappropriate.  Absent a preliminary injunction, Dr. Joshi could still apply for external funding, and if successful, reopen his lab.  The defendants, on the other hand, would have to continue to pay for a lab that they view as unproductive and divert scarce resources were the preliminary injunction granted.

Dr. Joshi must show "a balance of hardships decidedly favoring [him]."  N. Am. Soccer League, 883 F.3d at 37.  When weighing the equities involved on a motion for preliminary injunction, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) (quoting Amoco Prod. Co. v. Village of Gambell, Alaska, 480 U.S. 531, 542 (1987)).  "To establish that the balance of hardships tips in [his] favor, the [plaintiff] must demonstrate that the harm [he] would suffer absent the relief sought is substantially greater than the harm

the defendants would suffer if the injunction were granted."
Greylock Glob. Opportunity Master Fund Ltd. v. Province of
Mendoza, No. 04-CV-7643, 2004 WL 2290900, at *4 (S.D.N.Y.
Oct. 12, 2004) (citation omitted).

While Dr. Joshi demonstrated the inconvenience and burden
he will experience from his lab's closure, he has not shown that
the balance of hardships tips decidedly in his favor. Dr. Joshi
has not shown why the removal of his supplies would be
irreversible.  Everything the Department does in closing Dr.
Joshi's lab could be undone if Dr. Joshi secures external
funding and reopens his lab.  The defendants, though, have shown
that it would pose a significant burden on them to continue to
pay approximately $21,000 per month to keep Dr. Joshi's lab
open, after the Department has already been funding Dr. Joshi's
lab without external support for three years.  A preliminary
injunction would force the Department to spend its resources in
accordance with this Court's order, as opposed to its own
guidelines and determinations for resource allocation.  Given
the defendants' limited resources, and the autonomy with which
they should be able to allocate their funds, a preliminary
injunction would pose more hardship on the defendants than
denial of an injunction would pose on Dr. Joshi.

Dr. Joshi argues that the hardship imposed on the
defendants is limited because he has offered to post a security

pursuant to Federal Rule of Civil Procedure 65(c). See Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.") Posting security could minimize the harms imposed on the defendants but not eliminate them.  The financial harm that an injunction bond could mitigate does not account for the opportunity cost of funding a lab the Department sees as unproductive.  Regardless of any bond posted by Dr. Joshi, an injunction would require the Department to keep Dr. Joshi's equipment in its current space, thereby preventing the Department from using that space as it sees fit.  And while this action is pending, the Department would need to continue to provide Dr. Joshi with bridge funding, limiting its ability to fund other endeavors it views as worthwhile.  The defendants, not this Court, should determine how the Department uses its resources.  Therefore, Dr. Joshi failed to show that the balance of hardships tips decidedly in his favor.

### D. Public Interest

Despite Dr. Joshi's achievements in his field, he has not shown that a preliminary injunction would further the public interest.  Dr. Joshi has made significant contributions to the scientific community through his research, including his

research into the delivery of drugs to the brain.  However, the defendants and external funding organizations like the NIH have determined that resources would be better spent by funding other labs.  In moving for a preliminary injunction, Dr. Joshi has asked this Court to find that funding his lab is in the public interest, even when the NIH and the defendants have found it preferable to spend their resources elsewhere.  Contrary to Dr. Joshi's position, it is in the public interest that research universities have the autonomy to spend their resources in accordance with what they believe will yield the most fruitful outcomes.  The defendants have provided valid, reasonable explanations for why they believe their resources would be better spent elsewhere, and external funding organizations likewise have decided against funding Dr. Joshi's lab.  Dr. Joshi has failed to provide a sufficiently valid explanation for why it would be in the public interest for this Court to supplant the judgment of those more experienced in the field.

### III. CONCLUSION

The foregoing constitutes this Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(2).  The Court has considered all of the arguments raised by the parties.  To the extent not specifically addressed, the arguments are either moot or without merit.  The plaintiff's

motion for a preliminary injunction is **denied.** The Clerk is directed to close Docket No. 100.

  **SO ORDERED.**

**Dated:**  **New York, New York**
     **August 31, 2020**    <u>  /s/ John G. Koeltl  </u>
                 **John G. Koeltl**
           **United States District Judge**